E-FILED
Wednesday, 16 September, 2026 09:23:45 AM
Clerk, U.S. District Court, ILCD

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

---

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA and STATE OF ILLINOIS *ex rel.* THOMAS PROSE, M.D.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Case No. 25-CV-2290** |
| **HEALTH ALLIANCE MEDICAL PLANS, INC., and HEALTH ALLIANCE CONNECT, INC.,** | ) | |
| **Defendants.** | ) | |

**ORDER**

Relator, Thomas Prose, M.D., filed this qui tam action against Defendants Health Alliance Medical Plans, Inc. ("Health Alliance"), and Health Alliance Connect, Inc. ("HA Connect"), alleging that Defendants violated the federal False Claims Act ("FCA") (31 U.S.C. § 3729, et seq.) and the Illinois False Claims Act ("IFCA") (740 ILCS 175/3). On November 25, 2025, Defendants filed a Motion to Dismiss (#59). Relator filed his Response (#66) on January 12, 2026, and the government filed its Response (#68)[1] on January 26, 2026. For the following reasons, Defendants' Motion to Dismiss is DENIED.

---

[1]The United States and the State of Illinois declined to intervene in this case on behalf of Relator. The United States filed its Response for the limited purpose of defending the constitutionality of the qui tam provisions of the FCA. The United States's Response does not address any other arguments raised by Defendants in support of their Motion. The court would also note that references to "the government" in this Order generally means both the United States and the State of Illinois, unless otherwise specified.

## BACKGROUND

The following background is taken from the allegations in Relator's Complaint (#1). At this stage of the proceedings, the court must accept as true all material allegations of the Complaint, drawing all reasonable inferences therefrom in Relator's favor. See *United States v. Molina Healthcare of Illinois, Inc.* 17 F.4th 732, 738-39 (7th Cir. 2021).

*General Overview*

The FCA "prohibits the submission of false and fraudulent claims for payment to the government." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912 (7th Cir. 2009), citing 31 U.S.C. § 3729(a). "It also authorizes private citizens (called 'relators') to file civil actions on behalf of the government (called 'qui tam' actions) to recover money that the government paid on account of false or fraudulent claims." *Glaser*, 570 F.3d at 912, citing 31 U.S.C. § 3730(b)(1). Successful relators are motivated by the prospect of recovering sizable shares of the money paid to the government after bringing a successful claim. *Glaser*, 570 F.3d at 912.

A qui tam complaint must initially be filed under seal, with a copy of the complaint and supporting "material evidence" served on the government alone. *United States, ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 425 (2023), citing 31 U.S.C. § 3730(b)(2). "The [g]overnment then has 60 days (often extended for 'good cause') to decide whether to 'intervene and proceed with the action.'" *Polansky*, 599 U.S.

at 425, quoting 31 U.S.C. §§ 3730(b)(2)-(3). If the government passes on intervention, the relator then has "the right to conduct the action." *Polansky*, 599 U.S. at 425, citing 31 U.S.C. § 3730(b)(4)(B).

Relator brought this case on his own behalf and on behalf of the United States and the State of Illinois, alleging that Defendants, who are managed care contractors, "violated the FCA and IFCA by failing to provide important health care services to nursing home beneficiaries of Medicare and Medicaid and claiming, receiving, and retaining payments from the Government as if they had provided those services." Relator filed the Complaint under seal on December 8, 2021. On May 2, 2024, the government filed a Notice (#12) indicating that it would not intervene.

*General Factual Allegations*[2]

Parties

Relator is the founder and operator of General Medicine of Illinois Physicians, P.C. ("General Medicine" or "GenMed"). General Medicine is a provider of skilled

[2]In this Background section, the court will give a general overview of the factual basis for Relator's Complaint, as provided in the opening pages of the Complaint. Relator's Complaint is a sprawling 66-page document with nearly 200 individually numbered factual allegations in addition to eight counts brought under the FCA and IFCA. Many of the allegations are repetitive or overlap with each other. Moreover, many of the allegations provide background on the FCA, IFCA, Medicare, Medicaid, SNF services, and contracts between the government and health care services, with extensive citation to and quotations from various statutes and regulations, but are not exactly pertinent to the Motion to Dismiss and this Order. Therefore, the court will only include a brief recitation of Relator's factual allegations in this Background so as to provide context to the reader on the nature of the case. The court may reference specific factual allegations from the Complaint that are *not* included in the Background later in this Order, where relevant, in addressing Defendants' dismissal arguments.

nursing facility ("SNF") services. "Under Illinois state law, SNF providers, known as 'SNFists,' are 'medical professional[s] specializing in the care of individuals residing in nursing homes employed by or under contract with a MCO[[3]]." *Molina Healthcare*, 17 F.4th at 737, quoting 305 ILCS 5/5F-15. SNFists provide specialized care intended to coordinate the care needs of nursing facility residents and thereby improve their health; reduce hospitalization and hospital readmission; and improve transitions from hospitals to the nursing facility and, for those who are able, back into the community.

Health Alliance and HA Connect are MCOs. Health Alliance is a privately held Illinois stock insurance corporation that offers healthcare coverage in Illinois. It describes itself as a "Health Maintenance Organization ["HMO"] formed for the purpose of delivering covered benefits to Illinois residents enrolled in Health Alliance (enrollees [or members]) using a network of contracted organizations and providers."

HA Connect is an affiliate of Health Alliance, and is a not-for-profit MCO that offers healthcare coverage in Illinois.

<u>Context of the Alleged Fraud</u>

The federal government (through the Centers for Medicaid and Medicare Services ("CMS")), and the State of Illinois (through its Department of Health and Family Services ("HFS")), offer health care programs intended to provide better coordinated and higher quality health care for individuals in Illinois who rely on the government for their health care. Medicaid-only beneficiaries are serviced by the

[3] MCO stands for "managed care organization."

Integrated Care Program ("ICP"), whereas dual-eligible Medicare/Medicaid beneficiaries are serviced by the Medicare-Medicaid Alignment Initiative ("MMAI") demonstration.

Defendants signed contracts with CMS and HFS[4], agreeing to provide managed health care plans for those beneficiaries in exchange for monthly "capitated payments."[5] The capitated payments were tiered, depending on, among other things, whether the beneficiary resided in the community, received home and community support through waivers, or resided in a nursing facility. The capitated payments were substantially higher for nursing facility beneficiaries. The government requires Medicaid-managed care providers, such as Defendants, to provide statutorily defined SNF services to all beneficiaries residing in a nursing facility, while also providing MCOs like Defendants "with a higher capitated rate to cover the increased cost." The basic concept is that

[4]The court will collectively refer to these contract as "the government contracts" unless individual specification is necessary.

[5]Capitation systems are similar to the traditional HMO model in which parties agree to a fixed per-patient fee that covers all services within the scope of a governing plan. *Molina Healthcare*, 17 F.4th at 736. Capitation payments are "periodic contractual fees, calculated per enrollee." *Molina Healthcare*, 17 F.4th at 737. "Each enrollment category had its own schedule of payments[,]" and a "given category's capitation rate reflected the anticipated costs per person on an amortized basis." *Molina Healthcare*, 17 F.4th at 737. Capitation rates "are more flexible" than traditional HMOs, as "[t]hey allow providers to establish distinct rate tiers, and the providers agree to delineate at the outset exactly what services they will furnish within each tier. Membership in each tier is correlated with factors such as age, health, and needed services. A Managed Care Organization plays an active role in the creation of the plan, as it needs to understand the risk it is assuming through its guarantee of services." *Molina Healthcare*, 17 F.4th at 737.

paying a higher reimbursement rate for SNF services on the front end would ultimately improve the quality of care for nursing facility patients and create greater savings on the back end from reduced hospital stays covered by Medicare.

Health Alliance signed ICP and MMAI contracts that were effective as of September 9, 2013, and March 1, 2014, respectfully. In exchange for its agreement to provide a SNF program for nursing facility enrollees, Health Alliance claimed, received, and accepted the highest capitation rate every month for each of those enrollees. But Health Alliance did not even subcontract with a single SNF provider for over a year and a half after the effective date of the ICP contract. It was not until April 15, 2015, that Health Alliance engaged General Medicine to provide a SNF program for its ICP and MMAI enrollees. But even then, the provision of SNF services was limited and short-lived.

General Medicine was prepared to provide a SNF program for all of Health Alliance's nursing facility enrollees from day one, but Health Alliance refused to assign all of those enrollees to General Medicine. Over the initial several months, Health Alliance also tried to renege on the amounts it had agreed to pay General Medicine per member per month and refused to pay General Medicine the amounts due for the enrollees it did serve.

Ultimately, Defendants stopped assigning nursing facility enrollees to General Medicine and terminated General Medicine's contract effective as of February 9, 2016. Still, Defendants continued to offer a health plan under the ICP until December 31, 2016.

Defendants also continued to receive, accept, and retain the highest capitation rate for their nursing facility enrollees throughout that time (close to 40 months) even though they were not providing a SNF program for all of these enrollees as required by the contracts.

Relator alleges that, based on exemplar capitation rates, the premium built into the nursing facility rate ranged from about $2,800 to $4,600 more than the community rate and between $1,400 and $2,000 more than individuals being serviced on waivers. Based on available numbers for Health Alliance nursing facility enrollees, Relator estimates that Health Alliance and HA Connect collected tens of millions of dollars for those beneficiaries, knowing full well that they were failing to provide all of them with the SNF services required under the government contracts and that these high-cost services, essential to the nursing facility population, were the very reason why the government paid a significantly higher capitation rate to support them.

Relator alleges that this fraudulent conduct violated the FCA and IFCA in multiple ways: (1) Defendants presented false claims and false statements to CMS and HFS that they were delivering SNF services when, in fact, they were depriving their eligible enrollees of those services; (2) Defendants fraudulently induced CMS and HFS to enter into the government contracts by stating their agreement to provide SNF services as required, but engaging in conduct showing no intent to honor that promise; (3) Defendants failed to return to the government the premium payments they received for providing SNF services, despite knowing that they had not provided the services for

which the payments were made; and (4) Defendants accepted money they received from the government for the purpose of providing a very specific benefit for a particularly vulnerable population and instead converted that money for their own use.

In sum, Relator alleges that "Defendants violated the FCA and the IFCA by charging Medicare and Medicaid for services they did not provide. This conduct resulted in false statements and claims made to, and payments made by, the federal government and the State of Illinois through Medicare and the Illinois Medicaid program, as well as overpayments that Defendants failed to reimburse and converted to their own use."

*Relator's Claims*

<u>Counts I and V</u>

Count I alleges "presentment of false claims" under the FCA, pursuant to 31 U.S.C. § 3729(a)(1)(A), in that Defendants, "in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval."

Relator continues that the government was unaware of the false or fraudulent nature of the claims Defendants submitted or caused to be submitted, and that the claims Defendants knowingly submitted or caused to be submitted "were material to whether the claims for payment were within" the government's legal authority to pay those claims. Relator further alleges that payment of the ineligible claims was a

reasonable and foreseeable consequence of Defendants' conduct, and, had the government actually known of the false or fraudulent nature of Defendants' representations and claims, it would have been prohibited by law from making corresponding payments to Defendants.

Count V alleges identical allegations under the IFCA, 740 ILCS 175/3(a)(1)(A).

Counts II and VI

Count II alleges "use of false statements material to false claims paid" under the FCA, pursuant to 31 U.S.C. § 3729(a)(1)(B), in that Defendants, "in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used false records or statements material to the payment of false or fraudulent claims."

Relator further alleges that the government was unaware of the falsity of the records or statements that Defendants made or caused to be made, and that the "false records or statements Defendants knowingly made were material to whether the claims for payment were within" the government's legal authority to pay those claims. Relator alleges that "[p]ayment of the ineligible claims was a reasonable and foreseeable consequence of Defendants' conduct," and, had the government actually "known of Defendants' materially false records or statements, it would have been prohibited by law from paying the affected claims."

Count VI alleges identical allegations under the IFCA, 740 ILCS 175/3(a)(1)(B).

Counts III and VII

Count III alleges "conversion" under the FCA, pursuant to 31 U.S.C. § 3729(a)(1)(D), in that Defendants "knowingly kept possession, custody, or control of property or money used, or to be used, by the government and knowingly delivered, or caused to be delivered, less than all of that money or property[.]" Relator alleges that the government, "unaware of Defendants' possession, custody, or control of property or money used, or to be used, by the government and unaware of Defendants' knowing delivery of, or causing to be delivered less than all of that money or property, has been deprived of money or property that it otherwise would have received."

Count VII alleges identical allegations under the IFCA, 740 ILCS 175/3(a)(1)(D).

Counts IV and VIII

Count IV alleges "obligation to pay money to the government" under the FCA, pursuant to 31 U.S.C. § 3729(a)(1)(G), in that "Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government[.]"

Relator further alleges that the government "was unaware of the falsity of the records or statements Defendants made or caused to be made and was unaware of Defendants' conduct that concealed or improperly avoided Defendants' obligation to

repay the federal government." Relator alleges that the "false records or statements Defendants knowingly made or caused to be made were material to Defendants' obligation to pay monies" to the government.

Count VIII alleges identical allegations under the IFCA, 740 ILCS 175/3(a)(1)(G).

*State Court Action*

Defendants, in their Motion, state that this "qui tam action is not the only pending lawsuit concerning what Relator calls the 'primary figures in this case' and GenMed's work as a subcontractor providing services to Health Alliance." Defendants state that Relator, by his company General Medicine, filed a breach of contract action in 2016 against Health Alliance in Illinois state court. In that case, Relator (via General Medicine) alleged breach of contract and sought to recover the monthly capitation payments that Health Alliance received from the government. Specifically, in the second amended complaint, General Medicine contended that Health Alliance breached their contract by failing to assign and/or permit General Medicine to provide SNF services to enrollees in nursing facilities entitled to services under Defendants' three government contracts. Defendants represent that the Illinois lawsuit is still ongoing.

## ANALYSIS

Defendants argue that Relator's Complaint must be dismissed because: (1) the FCA's qui tam provisions are unconstitutional; (2) it is incompatible with an ongoing state court action that Relator is pursuing; and (3) Relator's FCA and IFCA claims are insufficiently pled.

*Constitutionality of the FCA's Qui Tam Provisions*

Defendants argue that the Complaint should be dismissed because the FCA's qui tam provisions violate Article II of the U.S. Constitution, specifically Article II's Appointments Clause and Vesting and Take Care Clauses.

The Appointment Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and *all other Officers of the United States*, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. CONST. art. II, § 2, cl. 2 (emphasis added). Defendants first argue that the FCA's qui tam provisions violate the Appointments Clause by allowing relators, who are private individuals, "to wield power that only an 'Officer of the United States'" may wield, without satisfying the Constitution's appointment requirement for such Officers.

Neither the U.S. Supreme Court nor the Seventh Circuit[6] have directly weighed in on the constitutionality of the FCA's qui tam provisions under the Appointments Clause. However, in recent years, several Justices of the Supreme Court, and at least one circuit judge, have questioned whether the provisions violate the Appointments Clause. See *Polansky*, 599 U.S. at 442 (Kavanaugh, J., concurring, joined by Barrett, J.); *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 167 (2025) (Kavanaugh, J., concurring, joined by Thomas, J.); *United States ex rel. Montcrief v. Peripheral Vascular Associates, P.A.*, 133 F.4th 395, 410-412 (5th Cir. 2025) (Duncan, J., concurring) (explaining that the qui tam provisions are unconstitutional).

Only one district court has found that the "provision permits anyone—wherever situated, however motivated, and however financed—to perform a 'traditional, exclusive [state] function' by appointing themselves as the federal government's 'avatar in litigation[,]'" and that this "arrangement directly defies the Appointments Clause by permitting unaccountable, unsworn, private actors to exercise core executive power with substantial consequences to members of the public." *United States ex rel. Zafirov v. Florida Medical Associates, LLC*, 751 F.Supp.3d 1293, 1324 (M.D. Fla. 2024). However, *Zafirov* was recently reversed by the Eleventh Circuit Court of Appeals, which held that

[6]The Seventh Circuit has noted that "[a]s a general matter, the Supreme Court has reserved decision on the constitutionality under Article II of qui tam actions[,]" and that the "ancient pedigree" of qui tam actions, "together with their widespread use at the time of the Founding, suggests that the False Claims Act as a whole is not in imminent danger of unconstitutionally usurping the executive power." *United States v. UCB, Inc.*, 970 F.3d 835, 848 (7th Cir. 2020).

because relators do not occupy a continuing position, they "are not officers of the United States subject to the Appointments Clause." *United States v. Florida Medical Associates, LLC*, — F.4th —, 2026 WL 2581886, at *7 (11th Cir. Sept. 1, 2026).

Even before it was reversed, the *Zafirov* case was an outlier and criticized by other courts. See *Nemeh v. National Breathe Free Sinus & Allergy Centers LLC*, 2026 WL 1601278, at *3 (D. Az. June 4, 2026) (concluding, in reference to *Zafirov*, "[u]ltimately, this Court finds no reason to disregard binding Ninth Circuit authority and the nationwide circuit trend on the account of" a single, outlying case), citing *United States v. Chattanooga Hamilton County Hospital Authority*, 2024 WL 4784372, at *3 (E.D. Tenn. Nov. 7, 2024); *United States ex rel. Souza v. Embrace Home Loans, Inc.*, 808 F.Supp.3d 314, 330 n.1 (D.R.I. 2025) ("The Defendants primarily rely on a pair of rulings made by a judge in the U.S. District Court for the Middle District of Florida, which struck down the qui tam provisions of the FCA as violative of the Appointments Clause[,]" but "the Middle District of Florida court has been the only one to rule in this way."); *United States ex rel. Shepherd v. Fluor Corporation, Inc.*, 2026 WL 97279, at *7 (D.S.C. Jan. 14, 2026) ("First, *Zafirov* is a lone district court decision, currently on appeal, and does not alter the governing appellate landscape. This Court previously recognized that lower courts should not invalidate an Act of Congress on constitutional grounds absent controlling authority requiring such a result. Second, *Zafirov* is in tension with the substantial body of circuit precedent rejecting Article II challenges to the FCA's qui tam

provisions—authority this Court relied upon in denying Fluor's earlier motion. Third, even courts acknowledging *Zafirov* have declined to adopt its reasoning in light of contrary precedent.").

Moreover, every federal circuit court of appeal to consider this issue thus far has found that the FCA's qui tam provisions do not violate the Appointments Clause. *Souza*, 808 F.Supp.3d at 330 n.1, citing *United States ex rel. Stone v. Rockwell International Corp.*, 282 F.3d 787, 804-05 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hospital*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. General Electric Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 759 (9th Cir. 1993); *Florida Medical Associates*, — F.4th —, 2026 WL 2581886, at *7.

The court finds persuasive the analysis of whether the FCA's qui tam provisions are constitutional by the district court in *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 808 F.Supp.3d 917 (E.D. Wis. 2025). There, the court began its analysis by noting that "[a]n 'Officer of the United States' is someone who (1) exercises 'significant authority pursuant to the laws of the United States' and (2) holds a position that is 'continuing and permanent.'" *Heath*, 808 F.Supp.3d at 933, quoting *Lucia v. Securities and Exchange Commission*, 585 U.S. 237, 245 (2018). The court first found that a "relator's power is hardly 'unfettered,'" as, upon "commencing an action, a relator must notify the United States government, who is then given the opportunity to investigate and intervene[,]" and until "the United States makes its decision, the entire action is maintained under

seal." *Heath*, 808 F.Supp.3d at 933. "By intervening, the government can effectively take over the prosecution of the case[,]" and "can dismiss the action over the objection of the relator (as long as there is a hearing on the matter) or restrict the participation of the relator." *Heath*, 808 F.Supp.3d at 933. The court further stated that, even if the government does not intervene, "it may nonetheless remain appraised of the action upon request and intervene at a later time." *Heath*, 808 F.Supp.3d at 933. "For all of these reasons," the court concluded, "relators lack the necessary authority to be deemed 'Officers of the United States.'" *Heath*, 808 F.Supp.3d at 933, citing *Kelly*, 9 F.3d at 758 ("[W]e find it impossible to characterize the authority exercised by relators as so 'significant' that it must only be exercised by officers appointed in the manner which [the Appointments Clause] prescribes."); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F.Supp. 611, 623 (W.D. Wis. 1995) ("[R]elators are not vested with sufficient authority to be deemed 'Officers of the United States.'").

The court continued its analysis, stating that even if it were to concede the significant authority of the relators, "the position is not 'continuing and permanent.'" *Heath*, 808 F.Supp.3d at 933-34. "To be 'continuing'" means that the "duties continue, though the person ... change[s].'" *Heath*, 808 F.Supp.3d at 934, quoting *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747). But, as the government noted, "the position of a qui tam relator is fundamentally personal. Once an FCA qui tam action has commenced, the only entity that may intervene is the United States[,]" and "[t]hus, no one can take over the duties of the relator—the action begins with a

particular relator and ends with a particular relator." *Heath*, 808 F.Supp.3d at 934. A further distinction is that "[t]he position cannot be occupied by any other person. Contrast this with the office of the Attorney General, which can be occupied by anyone so appointed, and which continues to exist if the individual occupying the position dies, resigns, or otherwise vacates the office." *Heath*, 808 F.Supp.3d at 934. Therefore, the court found "that the qui tam provisions of the FCA do not violate the Appointments Clause of the Constitution." *Heath*, 808 F.Supp.3d at 934.

The analysis in *Heath* is sound, and the court will follow it. The FCA's qui tam provisions do not violate the Appointments Clause.

The court next turns to Defendants' argument under the Vesting and Take Care Clauses. "Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 203-04 (2020), quoting Art. II, § 1, cl. 1; Art. II, § 3. Defendants argue that the FCA's qui tam provisions violate those Clauses by impermissibly vesting executive power in relators, while denying the President removal authority and sufficient supervisory control of relators. Defendants argue that relators "exercise quintessential executive power by conducting civil litigation on behalf of the United States, and the President can neither remove nor adequately supervise them."

The court in *Heath* rejected such arguments, noting that "the government retains significant control over qui tam actions and can intervene to direct litigation in a particular way[,]" and that, "a relator cannot bring an FCA qui tam action if the United States files a case based upon the same underlying facts." *Heath*, 808 F.Supp.3d at 934. The court went on to note that a "relator is similarly barred from filing suit if the government makes public the findings of an investigation revealing the underlying facts, unless the relator is an original and independent source for the information[,]" and that, "[i]n other words, when the United States is aware of a potential FCA violation, it has the power to bring suit without a relator. The government is in control of the suit." *Heath*, 808 F.Supp.3d at 934.

Moreover, the court found that "the long and storied history of qui tam actions is at minimum persuasive if not dispositive that these provisions are consistent with the original understanding of Article II." *Heath*, 808 F.Supp.3d at 935, citing *Marsh v. Chambers*, 463 U.S. 783, 790 (1983). "Qui tam actions have a 'long tradition' in England and the American Colonies dating all the way back to the end of the 13th century, and the First Congress passed a number of statutes with qui tam provisions." *Heath*, 808 F.Supp.3d at 935, citing *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 774-77 (2000). "'[I]t is logically inescapable that the same history that was conclusive on the Article III question in *Stevens* with respect to qui tam lawsuits initiated under the FCA is similarly conclusive with respect to the Article II question concerning this statute.'" *Heath*, 808 F.Supp.3d at 935, quoting *Riley*, 252 F.3d at 752.

"Finally," the court found, "many other courts have persuasively rejected these constitutional challenges to the FCA's qui tam provisions." *Heath*, 808 F.Supp.3d at 935, citing *United States ex rel. McCullough v. Anthem Insurance Companies, Inc.*, 2025 WL 2782576, at *15-16 (S.D. Ind. Sept. 30, 2025); *United States ex rel. Bantsolas v. Superior Air & Ground Ambulance Transport, Inc.*, 2004 WL 609793, at *5 (N.D. Ill. Mar. 18, 2004); *Stone*, 282 F.3d at 805-06; *Riley*, 252 F.3d at 753; *Fallon*, 921 F. Supp. at 623; *Taxpayers Against Fraud*, 41 F.3d at 1041; see *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993) ("FCA qui tam provisions do not usurp the executive branch's litigating function because the statute gives the executive branch substantial control over the litigation.").

The court again finds *Heath* persuasive, and joins it and other courts in holding that the FCA's qui tam provisions do not violate the Vesting and Take Care Clauses. See *Souza*, 808 F.Supp.3d at 330 n.1 (finding that "[c]ourts have also routinely rejected the Defendants' Take Care and Vesting Clause argument[,]" (citing *Stone, Riley, Taxpayers Against Fraud,* and *Kelly*) and further noting that the court in *Zafirov* did "not even address this particular argument").

The court will follow the analysis of and apply the holding in *Heath* that the qui tam provisions in the FCA do not violate Article II. Moreover, the court "sees no reason to go against the clear weight of authority by ruling that the FCA's qui tam provisions are unconstitutional." *Souza*, 808 F.Supp.3d at 330 n.1. "While individual Justices of the Supreme Court have recently acknowledged that such challenges raise 'substantial

arguments,' those writings are not holdings and do not displace binding appellate precedent upholding the statute." *Shepherd*, 2026 WL 97279, at *6 (citations omitted). Defendants' Motion is DENIED on this ground.

*Whether Relator's Concurrent State Court Case Bars the Instant Action*

Defendants next argue that the court "should dismiss this action because it is incompatible with an ongoing state court action that Relator is pursuing." Specifically, Defendants argue that "Relator should be judicially estopped from pursuing this qui tam action because he is simultaneously asserting an inconsistent theory in his company's state court action against Health Alliance." Defendants state that Relator's Illinois court breach of contract suit demands payment from Health Alliance in connection with the same capitation payments that Relator in this case alleges were fraudulently obtained by Defendants. "If that were permitted, Relator could stand to profit in the state court breach of contract action based on the very same conduct that he claims is fraudulent in this case." Therefore, Defendants request the court apply judicial estoppel and dismiss this action as "incompatible" with the Illinois case.

Relator responds that Defendants cannot establish any of the three factors the court must consider in determining whether to apply judicial estoppel. Relator argues that Defendants cannot show that the Illinois breach of contract action is "contradictory" to the instant qui tam action for fraud; that Relator has not succeeded in the state court case, as it is still pending; and that there is no unfairness in allowing this case to proceed in light of the state court action.

"Judicial estoppel 'bars a party from prevailing on a position in court and then taking the opposite position at a different stage or in new proceedings.'" *Kaiser v. ALCOA USA Corp.*, — F.4th —, 2026 WL 2364300, at *8 (7th Cir. Aug. 14, 2026), quoting *United States v. Sweatt*, 85 F.4th 1240, 1242 (7th Cir. 2023). "It is 'an equitable doctrine invoked by a court at its discretion.'" *Kaiser*, — F.4th —, 2026 WL 2364300, at *8, quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

"Judicial estoppel is not reducible to any general formulation of principle, though the inquiry is typically informed by several factors." *Kaiser*, — F.4th —, 2026 WL 2364300, at *8 (cleaned up). "The Supreme Court has identified three considerations to guide the inquiry: (1) whether a party's later position must be clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Kaiser*, — F.4th —, 2026 WL 2364300, at *8 (cleaned up), citing *New Hampshire*, 532 U.S. at 750-51. "These are not rigid requirements but general guideposts that must be considered in the context of all the relevant equities in any given case." *Kaiser*, — F.4th —, 2026 WL 2364300, at *8 (cleaned up).

The court, in its discretion, will not judicially estop Relator's qui tam action at this time, as all of the factors weigh against the doctrine's application. First, the court agrees with Relator that Defendants have not satisfactorily explained how Relator's position in the breach of contract case is inconsistent with or contradictory to his position in the instant qui tam case. Even if Defendants could establish that the two positions are inconsistent, they have not sufficiently demonstrated how Relator would derive an unfair advantage or impose an unfair detriment on them if not estopped. Defendants arguments on this point are perfunctory and conclusory. See *William W. v. Saul*, 2020 WL 5493932, at *13 (S.D. Ind. Mar. 25, 2020), citing *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2018) ("The Seventh Circuit has warned attorneys, time and again, that perfunctory arguments, unsupported by pertinent authority, are deemed waived.").

Finally, there is no allegation that Relator has actually "succeeded" or "prevailed" in persuading the state court to accept his earlier position, which is fatal to Defendants' judicial estoppel argument. See *Urbania v. Central States, Southeast and Southwest Areas Pension Fund*, 421 F.3d 580, 589 (7th Cir. 2005) ("But even were we to assume an identity of facts and the defendant's assumption of a contrary position, judicial estoppel cannot be invoked here because Central States never prevailed upon a court to adopt that position—Turner's case was dismissed for lack of jurisdiction and its merits never reached. Thus, judicial estoppel does not here apply." (citation omitted)); *Pakovich v. Broadspire Services, Inc.*, 535 F.3d 601, 605 n.2 (7th Cir. 2008) ("Thus, one of the

requirements for judicial estoppel to apply is that the party to be estopped must have prevailed upon the first court to adopt the position. This did not occur here. Pakovich initially argued that she should be granted disability benefits under the 'any occupation standard because the Plan failed to provide any reason why she should be denied those benefits. The district court plainly rejected that argument in its order on Pakovich's Rule 52 motion. Accordingly, Pakovich did not prevail on this issue in the first instance and judicial estoppel is thus inapplicable." (cleaned up)). Indeed, Defendants specifically state that the state court litigation remains ongoing. The court will not apply judicial estoppel. Therefore, Defendants' Motion is DENIED on this ground.

*Whether Relator's FCA and IFCA Claims Are Sufficiently Pled*

Defendants next argue that the court should dismiss Relator's claims as insufficiently pled. Defendants argue that Relator has not adequately alleged a false claim, and that he has not adequately alleged the "knowledge" element of his claims.

<u>False Claim</u>

Defendants argue that Relator has failed to plead a false claim under the FCA/IFCA because his "Complaint is merely based on capitation payment requests" and he "does not plausibly plead that Defendants provided inadequate SNFist services."

As an initial matter, the court would note that Relator's claims under the FCA/IFCA sound in fraud, and thus this "is not a case that is governed by the usual notice-pleading standards of Federal Rule of Civil Procedure 8." *Molina Healthcare*, 17

F.4th at 739, citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, "[a] party bringing a case alleging fraud must satisfy the heightened pleading standards set forth in Rule 9(b), which says that '[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *Molina Healthcare*, 17 F.4th at 739, quoting Fed. R. Civ. P. 9(b). "At the same time, Rule 9(b) carves out several matters that may be alleged generally, including '[m]alice, intent, knowledge, and other conditions of a person's mind.'" *Molina Healthcare*, 17 F.4th at 739, quoting Fed. R. Civ. P. 9(b).

"Rule 9(b)'s more demanding pleading requirements apply to suits brought under the False Claims Act." *Molina Healthcare*, 17 F.4th at 739. Therefore, Relator must describe the "who, what, when, where, and how" of the fraud to survive a motion to dismiss. *Molina Healthcare*, 17 F.4th at 739. "Nonetheless, courts and litigants should not take an overly rigid view of the formulation; the allegation must be precise and substantiated, but the specific details that are needed to support a plausible claim of fraud will depend on the facts of the case." *Molina Healthcare*, 17 F.4th at 739 (cleaned up). The IFCA applies the same standards as the FCA. *Molina Healthcare*, 17 F.4th at 739.

Turning to the statute itself, the FCA "makes it unlawful knowingly (1) to present or cause to be presented a false or fraudulent claim for payment to the United States, (2) to make or use a false record or statement material to a false or fraudulent claim, or (3) to use a false record or statement to conceal or decrease an obligation to

pay money to the United States." *Molina Healthcare*, 17 F.4th at 739. "A successful claim requires proof both that the defendant made a statement to receive money from the government and that he made that statement knowing it was false." *Molina Healthcare*, 17 F.4th at 739-40.

However, not all false statements are actionable under the FCA, as a plaintiff must also prove that the violation proximately caused the alleged injury. *Molina Healthcare*, 17 F.4th at 740. "In other words, the pecuniary losses must be 'within the foreseeable risk of harm' that the false statement created." *Molina Healthcare*, 17 F.4th at 740, quoting *United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017).

In addition, the defendant's conduct must meet a strict materiality requirement, as it "is not enough simply to say that the government required compliance with a certain condition for payment." *Molina Healthcare*, 17 F.4th at 740. "The facts must indicate that the government actually attaches weight to that requirement and relies on compliance with it. In sum, as the Third Circuit has put it, the relator must establish (1) falsity, (2) causation, (3) knowledge, and (4) materiality." *Molina Healthcare*, 17 F.4th at 740, citing *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

The FCA is not limited to claims that are facially false, but rather "covers a defendant's more general decision [to] fraudulently to procure payment from the government." *Molina Healthcare*, 17 F.4th at 740. "Consequently, while the archetypical claim is one in which a claim for payment is itself literally false and fraudulent, courts have identified particular theories that support FCA claims, including (1) false

certification to the government that the party has complied with a statute, regulation, or condition of payment; (2) promissory fraud, or fraud in the inducement; and (3) implied false certification." *Molina Healthcare*, 17 F.4th at 740 (cleaned up).

"The implied false certification claim involves the omission of key facts rather than affirmative misrepresentations." *Molina Healthcare*, 17 F.4th at 740. "This type of liability arises if the 'defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements[;] those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.'" *Molina Healthcare*, 17 F.4th at 740, quoting *Universal Health Services, Inc. v. United States*, 579 U.S. 176, 187 (2016).

Defendants first argue that Relator has not alleged any *specific* misrepresentations or omissions that were made by them to the government. Instead, Defendants argue, "Relator's claims are merely based on capitation payments[,]" and "Defendants' mere request for capitation payments under the contracts by itself is not a 'false' claim for purposes of sufficiently pleading an FCA claim."

However, as noted by Relator, the Seventh Circuit has already found that he sufficiently pled FCA fraud claims under Rule 9(b) in a separate case that he brought against a healthcare provider for accepting capitation payments for SNF services that the provider, Molina Healthcare, failed to provide. Relator argues that his allegations in the instant case are substantially similar to those the Seventh Circuit found sufficient in *Molina Healthcare*.

In *Molina Healthcare*, Relator accused Molina Healthcare of all three FCA theories: factual falsity, fraud in the inducement, and implied false certification. *Molina Healthcare*, 17 F.4th at 740. Relator alleged "that after April 2, 2015, Molina submitted to the government materially fraudulent enrollment forms for each new enrollee in the Nursing Facility category of patients. As of that date, its contract with GenMed had ended, and it could not, and did not, provide SNF services." *Molina Healthcare*, 17 F.4th at 741. The Seventh Circuit found that allegation sufficient to allege factual falsity, writing that Relator "provided numerous details indicating when, where, how, and to whom allegedly false representations were made. He hardly can be blamed for not having information that exists only in Molina's files." *Molina Healthcare*, 17 F.4th at 741. The Seventh Circuit found that Relator "did provide information that plausibly supports the inference that Molina included false information about the pertinent services for new enrollees." *Molina Healthcare*, 17 F.4th at 741. The court continued:

> How else could it have asked for its capitation payments based on these additional beneficiaries? A direct assertion that Molina had new enrollees who were in the skilled nursing facility tier, coupled with an assertion that Molina was seeking reimbursement for their SNF services, is not an omission. It is a statement, and in this case a statement that Prose asserts was false. He did not need any more to defeat the challenge to the adequacy of his complaint.

*Molina Healthcare*, 17 F.4th at 741.

Likewise, in the instant case, Relator has alleged that Defendants "presented false claims and false statements to CMS and HFS that they were delivering SNFist services when, in fact, they were depriving their eligible enrollees of those services." In support

of this claim, Relator alleges that in 2013 and 2014, Defendants signed contracts with the government in which they received and accepted the highest capitation rate for every month for each of its enrollees, and in exchange, Defendants would "provide a SNFist program for nursing facility enrollees." But, per Realtor's allegations, Defendants did not provide such services until contracting with General Medicine in April 2015, but "even then the provision of SNFist services was limited and short-lived." Relator alleges that Defendants terminated their contract with General Medicine to provide SNF services in April 2016, yet kept collecting capitation payment rates from the government until at least December 2016 for nursing facility enrollees, despite not providing SNF services to those enrollees as required by their government contracts in order to receive the high capitation rates. Thus, as in *Molina Healthcare*, Relator has sufficiently alleged a fraud claim based on factual falsity under the FCA.

The Seventh Circuit in *Molina Healthcare* also found Relator had sufficiently alleged fraudulent inducement. Relator "needed to alert Molina with the necessary specificity of how it allegedly misrepresented its compliance with a condition of payment in order to induce the government to enter into a contract." *Molina Healthcare*, 17 F.4th at 741. Relator alleged "that Molina fraudulently induced the Department to enter into contract renewals with Molina in 2016 and 2017 by affirmatively misrepresenting that it would continue to provide SNF services in its package for NF-category enrollees while not intending to do so." *Molina Healthcare*, 17 F.4th at 741.

The Seventh Circuit found that Relator "set forth precise allegations about the beneficiaries, the time period, the mechanism for the fraud, and the financial consequences[,]" which "was enough." *Molina Healthcare*, 17 F.4th at 741.

"Claims of fraudulent inducement also require the plaintiff to show that the defendant never intended to perform the promised act that induced the government to enter the contract." *Molina Healthcare*, 17 F.4th at 741. The Seventh Circuit found that Relator "put Molina on notice of this aspect of his case, too[,]" because he "included details about statements made by Molina's chief operating officer (COO), Benjamin Schoen, who stated in his deposition that Molina's 'staff did not have the ability or licensure to render [SNF] services.'" *Molina Healthcare*, 17 F.4th at 742. "Taken together with Molina's defunct contract with GenMed and its failure to seek out a replacement SNF provider, the complaint alleges that any promise by Molina to provide SNF services during the contract-renewal process was fraudulent on its face." *Molina Healthcare*, 17 F.4th at 742. The Seventh Circuit went on to observe that:

> This may even have been more detail than was necessary, taking into account the fact that Rule 9(b) permits intent to be alleged generally. Construing the allegations liberally, the complaint asserts that Molina made some representations about actual SNF services that would be offered. Schoen acknowledged that Molina did not have the personnel available to perform those services. The complaint thus concludes that Molina did not and never intended to seek out another SNF service provider. This sufficed to allege intent.

*Molina Healthcare*, 17 F.4th at 742.

Here, Relator has alleged that Defendants "fraudulently induced CMS and HFS to enter into the contracts by stating their agreement to provide SNFist services as required, but engaging in conduct showing no intent to honor that promise." Relator alleges that, based on certain questions Defendants had to answer in obtaining the government contracts, the explicit requirements for SNF programs in both the ICP and MMAI contracts, and the significant difference in capitation rates for enrollees residing in nursing facilities compared to the capitation rates for other waiver and community enrollees, Defendants "knew that CMS and HFS would not have entered into the ICP and MMAI contracts absent a promise to provide" a SNF program. Relator alleges that Defendants' conduct showed the promise was false when made, as Health Alliance "had not engaged any subcontractor to provide those services at the time it made its offer and entered into the contracts in 2013[,]" and that "Health Alliance further demonstrated no intent to provide a SNFist program for all nursing facility enrollees by delaying engagement of a SNFist provider until April 2015, by failing to assign all eligible nursing facility enrollees to General Medicine, failing to pay General Medicine for the SNFist services provided, and failing to replace General Medicine with another SNFist provider." Relator alleges Defendants repeated this fraudulent conduct in the contractual amendments.

Relator further alleges that, "[d]uring the time period that General Medicine was on contract (i.e., from April 15, 2015 to February 9, 2016) Health Alliance and/or Health Alliance Connect signed a new contract with HFS at least by August 12, 2015[,]" but

that Defendants knew at the time they "signed the contract that they were not providing SNFist services to all enrollees and, by refusing to assign all nursing facility enrollees to General Medicine, showed their intent never to provide SNFist services to all enrollees as required by applicable contracts, thereby engaging in additional conduct constituting fraudulent inducement." These allegations may be more general than the ones presented in *Molina Healthcare*, but Rule 9(b) permits intent to be alleged generally. See *Molina Healthcare*, 17 F.4th at 742.

The Seventh Circuit in *Molina Healthcare* also found that Relator had sufficiently pled a theory of implied false certification. "In order to plead an actionable FCA claim under the implied certification theory, Relator must allege that defendants (1) submitted a claim for payment that (2) made specific representations about the services provided or failed to disclose violations of legal requirements that would make such representations misleading half-truths, and (3) those misrepresentations would be material to the Government's payment decision." *United States ex rel. Nedza v. American Imaging Management, Inc.*, 2019 WL 1426013, at *6 (N.D. Ill. Mar. 29, 2019), citing *Universal Health Services*, 579 U.S. at 190.

The Seventh Circuit in *Molina Healthcare* found that the complaint, read in Relator's "favor, contains specific allegations showing that Molina was far from a passive recipient of a favorable capitation rate." *Molina Healthcare*, 17 F.4th at 743. Relator "was not relying on Molina's receipt of capitation payments for existing enrollees[,]" but, "[r]ather, the complaint alleges that by submitting enrollment forms

for new enrollees after Molina canceled its contract with GenMed, Molina implicitly falsely certified that Nursing Facility enrollees had access to SNF services. But they did not." *Molina Healthcare*, 17 F.4th at 743. "Construed in [Relator's] favor, the complaint describes Molina's noncompliance with a contractual requirement to provide SNF services to Nursing Facility enrollees." *Molina Healthcare*, 17 F.4th at 743.

Likewise here, Relator is not just relying on Defendants' capitation payment requests. Rather, Relator alleges that Health Alliance "failed to disclose to the Government from the very beginning that it was not prepared and did not intend to meet the SNFist requirements, thereby making all 'readiness' statements false." Relator further alleges that the government contracts "required Health Alliance to report in various ways (e.g., encounter data, compliance, and quality control functions) its compliance with the requirements of the ICP and MMAI contracts."

Moreover, Relator alleges that to the extent that Defendants "provided any encounter data directly or impliedly claimed that a SNFist program was provided to nursing facility enrollees, those statements were false except for the very small subset of enrollees that General Medicine was allowed to serve." "By asserting that it was in compliance with the contracts and failing to tell the truth about its failure to provide a SNFist program to its enrollees," Relator alleges, "Health Alliance knowingly, impliedly, and falsely certified that it was providing services for which it was entitled to

payment when, in fact, it was not providing those services." Relator also alleges "Health Alliance also covered up its fraudulent conduct by failing to report its termination of General Medicine to HFS."

Based on the foregoing, Relator has alleged that, in all of their contracts with the government, Defendants have implicitly falsely certified that nursing facility enrollees had access to SNF services, but, aside from the small subset briefly served by General Medicine, they did not. See *Molina Healthcare*, 17 F.4th at 743. Construed in Relator's favor, the Complaint describes Defendants' noncompliance with a contractual requirement to provide SNF services to nursing facility enrollees. See *Molina Healthcare*, 17 F.4th at 743.

Thus, the court denies Defendants' Motion on the grounds that Relator's FCA fraud claims allege mere receipt of capitation payments, instead of specific misrepresentations.

Defendants next argue that Relator has not plausibly plead that they provided inadequate SNF services. Defendants argue that, "[a]t most, Relator alleges that he '*was not aware* of any provider other than General Medicine that provided a SNFist program to Health Alliance or Health Connect." But, this "mere belief," Defendants argue, "does not mean that Defendants did not actually provide the SNFist services without GenMed's clinical staff." Defendants point to the language of their contracts with the government, which did not require them to "engage GenMed to provide the necessary services, as Defendants were permitted to 'provide the SNFist services, either through

direct employment or a sub-contractual relationship' beyond GenMed." Defendants contrast this with Relator's complaint in *Molina Healthcare*, where he specifically alleged that Molina "was not delivering SNF services to anyone, either with its own personnel or through a subcontractor" and was "not even looking for a replacement for GenMed."

The court, finds that, taking all of Relator's allegations as true and drawing all reasonable inferences therefrom in Relator's favor, the Complaint sufficiently alleges that Defendants failed to provide SNF services. The allegation quoted above by Defendants states in full: "As stated above, Relator was aware of the market and the providers of SNFist services. He was not aware of any provider other than General Medicine that provided a SNFist program to Health Alliance or Health Alliance Connect. Nor was he aware through his knowledge of the market or any public source that Health Alliance received any deficiency notices related to SNFist services or that any sanctions, corrective action plans, or penalties were imposed on Health Alliance or Health Alliance Connect for these failures." Taking all reasonable inferences in favor of Relator, the allegation states that Relator was familiar with and knew the SNF market in the relevant area, and that there were no other SNF providers who had provided or could provide SNF services to Defendants outside of General Medicine.

The Complaint further alleges that, based on the April 15, 2015, letter from Defendants to nursing facilities with their enrollees announcing the "INTRODUCTION OF SNFIST PROGRAM," and stating the nursing facilities "must have a SNFist program provider overseeing [residents'] care while in your facility" and that

Defendants had chosen General Medicine "as the SNFist program specialist for all our members[,]" "it is evident" that Defendants had not offered any SNF program under their government contracts until April 15, 2015—18 months after they were required to by the ICP contract.

Relator further pleads that "when negotiations were occurring and when preparing for the implementation of a SNFist program effective April 15, 2015, Relator saw nothing indicating that Health Alliance was already operating a SNFist program of any type[,]" as "[t]here was no handoff of patients, and General Medicine had to develop the program from scratch." Additionally, "since General Medicine was in the same marketplace as Health Alliance, Relator was aware of who the SNFist providers were, and he was not aware that any of them were providing SNFist programs for Health Alliance prior to General Medicine or, after General Medicine was terminated, for Health Alliance or Health Alliance Connect." Finally, later in the Complaint Relator specifically alleges "[f]or 32 months, Health Alliance provided no SNFist program at all[,]" and that "[f]or the very limited 7 months that Health Alliance actually assigned enrollees to General Medicine, generally half or more of its nursing facility enrollees were not included and received no SNFist services."

The court, again applying the relevant standard at the pleading stage, finds that Relator has sufficiently alleged that, outside of the brief employment by Defendants of

General Medicine, Defendants failed to provide SNF services to their enrollees during the relevant time period of the government contracts. Defendants' Motion is DENIED on this ground.

Knowledge

Defendants next argue that the court should dismiss Relator's Complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) because Relator has not sufficiently pled the "knowledge" element of his claims. Defendants argue that Relator's knowledge allegations are conclusory and lack the requisite description of Defendants' state of mind. Moreover, the relevant allegations are alleged "upon information and belief," which is insufficient to allege knowledge under Rule 9(b).

Relator responds that the knowledge allegations in the instant Complaint mirror those the Seventh Circuit found sufficient in *Molina Healthcare.*

In *Molina Healthcare*, the district court had found Relator failed to sufficiently allege knowledge, in that he failed to allege that Molina knew that the government viewed SNF services as material. *Molina Healthcare*, 17 F.4th at 744. "Even though Molina necessarily knew that it had violated the contractual requirement to provide SNF services, the district court thought that [Relator's] allegations that Molina knew that these services were material were conclusory and need not be accepted as true." *Molina Healthcare*, 17 F.4th at 744. "The allegations, it said, at most supported a

conclusion that Molina's actuarial consultants coordinated the payment scheme with the government. Missing, it thought, was a contention that Molina was involved in calculating the capitation rates." *Molina Healthcare*, 17 F.4th at 744.

The Seventh Circuit found that this was error, as "the court failed to give proper weight to the complaint's description of Molina as a highly sophisticated member of the medical-services industry." *Molina Healthcare*, 17 F.4th at 744. As such, "Molina was quite familiar with capitation rates, and it knew that they are designed to allow the provider to be reimbursed for services rendered. And recall that this was a risk contract: Molina had a strong incentive to ensure that the capitation rate was high enough to cover its costs plus a reasonable profit, because it would be left holding the bag if the rate were too low." *Molina Healthcare*, 17 F.4th at 744. The Seventh Circuit noted that "knowledge may be alleged generally, even in a case under Rule 9(b), and so the district court was wrong to insist that Prose identify concrete evidence of actual knowledge." *Molina Healthcare*, 17 F.4th at 744-45. The Seventh Circuit concluded that "[c]onstruing the allegations in [Relator's] favor, there is ample detail to support a finding that Molina either had actual knowledge that the government would view skilled nursing services as a critical part of the Nursing Facility rate cell (i.e., as material), or that it was deliberately ignorant on this point. Once again, these high-cost services, essential to the nursing-home population, were the very reason why the government paid a capitation rate more than fifty times as much to support them." *Molina Healthcare*, 17 F.4th at 744.

In the instant case, paragraph 183 of Relator's Complaint alleges:

> As a sophisticated veteran of the medical services industry for over 30 years, Health Alliance understood how capitation rates were derived and that they are designed and actuarially calculated to provide reimbursement to the contractor for services rendered. Health Alliance also understood that it had entered into a risk contract intended to cover the costs of all services required, including the SNFist program. Thus, Health Alliance had a strong incentive to ensure that the capitation rate was high enough to cover its costs plus a reasonable profit, because it would not profit, and might even lose money, if the rate were too low. Finally, by the very difference among capitated rate cells, Health Alliance knew that the Government viewed the services required for nursing facility enrollees as critical, thereby justifying a capitation rate multiple thousands of dollars higher than the community rate.

The court agrees with Relator that the allegations in the Complaint mirror those the Seventh Circuit found adequate to allege knowledge in *Molina Healthcare*, and therefore Defendants' Motion is DENIED on this ground.

*Whether Relator's Claims for Conversion and Reverse False Claims Should Be Dismissed as Redundant of His Other Claims*

Defendants argue that even if the court finds that Relator's FCA and IFCA claims are sufficiently pled, the court "still should dismiss Relator's claims for conversion (Counts III and VII) and reverse false claims (Counts IV and VIII) on the basis that they are improperly duplicative of his other claims." The court, at this time, declines to dismiss those claims as duplicative. Defendants arguments are well-taken, and the court is aware that other courts have dismissed such claims as duplicative of other FCA claims under similar circumstances. Therefore, these arguments may be raised in a later motion once the record is more developed in this regard, and a fuller and more

searching analysis can be performed. See *Lewis v. County of Macon*, 2018 WL 11386909, at *7 (C.D. Ill. Oct. 16, 2018). Defendants' Motion is DENIED on this ground.

IT IS THEREFORE ORDERED THAT:

(1) Defendants' Motion to Dismiss (#59) is DENIED.

(2) This matter is referred back to the magistrate judge for further proceedings consistent with this Order.

ENTERED this 16th day of September, 2026.

s/ COLIN S. BRUCE
CHIEF U.S. DISTRICT JUDGE